# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
### SPRINGFIELD DIVISION

| | | |
|---|---|---|
| DANA M. HENRY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  08-3110 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>OPINION</u>

JEANNE E. SCOTT, U.S. District Judge:

Plaintiff Dana M. Henry appeals from a final Decision of the Social Security Administration (SSA) denying her application for Disability Insurance Benefits (DIB) under Chapter II of the Social Security Act, 42 U.S.C. § 423.  Henry brings this appeal pursuant to 42 U.S.C. § 405(g). The parties have filed cross-motions for summary judgment or affirmance pursuant to Local Rule 8.1(D).  <u>Plaintiff's Motion for Summary Judgment and Memorandum of Law in Support Thereof (d/e 11)</u>; <u>Motion for Summary Affirmance (d/e 13)</u>.  Henry asks this Court to find her disabled.

BACKGROUND

Henry applied for Disability Insurance Benefits (DIB) on October 9, 2003.  She alleges that she suffers from chronic back, hip, and leg pain and depression.  The SSA denied her claims initially and on reconsideration.  Henry requested a hearing, which was held November 21, 2006.  On December 8, 2006, an Administrative Law Judge (ALJ) issued a Decision denying Henry's application.  Henry filed a request for Appeals Council review, and the Appeals Council remanded the case back to the ALJ.  On September 14, 2007, the ALJ held a second hearing, and on October 16, 2007, he again issued a Decision denying Henry's application.  The Appeals Council denied Henry's second request for review, and Henry now seeks judicial review.

I.   MEDICAL HISTORY

Henry alleges that she became disabled on July 6, 2001.  At the time, she was working as a machine operator, which required her to stand 8 to 10 hours a day, with regular lifting of 25 to 35 pounds.  For at least several months before, Henry had been experiencing back, hip, and leg pain and depressive symptoms.  In a June 28, 2001, visit with Dr. Geoffrey Bland, Henry stated that she previously had undergone physical therapy, epidural

injections, and medical pain management, all without sufficient improvement.  She told Dr. Bland that she intended to quit her job because she believed it was exacerbating her symptoms.  Dr. Bland found that her spine had a fairly full range of motion, but she was tender along the left SI joint and into the left iliac wing area.  He also found that she had increased pain on the left side during straight leg raises.  Dr. Bland prescribed pain medication and an exercise program.

Dr. Bland also noted that Henry had "finally agreed" to see a psychiatrist.  Adm. Rec. (d/e 8) (R.) 376.  His records state that Henry believed her depression was secondary to her pain.  He observed that while her thought content and memory seemed intact, she became tearful intermittently and had a definite flattened affect.

On March 22, 2002, Henry returned to Dr. Bland's office and reported worsening symptoms of depression.  Dr. Bland noted a definite change in personality over the last couple years, "with more flattened affect, increased signs of depression."  R. 374.  Henry was tearful at this appointment and said she felt "like she would like to die when she's in pain all the time."  R. 374.  She informed Dr. Bland that she was scheduled for a disk fusion in her lumbar spine soon.  Dr. Bland prescribed Wellbutrin.

In a follow-up visit on April 11, 2002, he noted marked improvement on the Wellbutrin.

On April 18, 2002, Henry underwent surgery for an L5-S1 anterior interbody fusion.  Dr. Timothy VanFleet performed the surgery.  His notes state that the surgery was uneventful and she was discharged on April 21, 2002, in good condition.  At a follow-up visit six months later, on September 20, 2002, Dr. VanFleet found that Henry could stand and ambulate "without any difficulty whatsoever." R. 391.  Additionally, X-rays demonstrated that the implant remained in good position.  Henry complained of continued back pain, however, primarily when she was "up and moving around." R. 391.  Dr. VanFleet saw pain management as her only option and referred her to Dr. Koteswara Narla for evaluation.

Henry saw Dr. Narla on October 4, 2002.  Henry told Dr. Narla that before her surgery, she rated her back pain as 9 or 10 out of 10, but since the surgery it had been only 5 out of 10.  She explained that the pain was continuous, grinding, aching, and sharp.  Her pain lessened with cold packs and when she laid down or sat with elevated legs.  Henry said that standing, walking, sitting, and driving all increased her pain.  Dr. Narla found that Henry had "a tendency to magnify things during the conversation," but

noted that MRI scans on August 3, 1999, showed a mild diffuse disc bulge at L4-5 and a mild right paracentral disc bulge at L5-S1.  R. 426.  He added, however, that he saw "clearcut evidence of symptom magnification in this lady for some unknown reason, which I do not understand."  R. 425.

On November 6, 2002, Dr. Narla saw Henry again and noted possible neuropathic pain.  He advised lowering her dosage of Neurontin, a medication used to treat nerve pain, and noted, "I do not think there is any necessity of interventional procedures such as epidural injection at this stage as she is able to function quite well."  R. 423.

On November 19, 2003, Dr. Vittal Chapa performed a consultative examination for the SSA.  At this examination, Henry demonstrated tenderness on palpation of the sacroiliac joints, or those at the base of the spine.  Dr. Chapa found no evidence of nerve root compression and noted that Henry had no difficulty with ambulation.  He concluded that she could perform fine and gross manipulation with both hands.

On November 20, 2003, Linda Lanier, a licensed clinical psychologist, performed a consultative examination for the SSA.  Henry told Lanier that her worst depression occurred five years before, when she was trying to work in spite of significant pain.  Henry stated that she was currently

experiencing mild symptoms of depression, including trouble sleeping and a feeling of hopelessness.  She was no longer on medication, but took some briefly five years earlier.  Lanier diagnosed Henry with dysthymic disorder and a GAF of 55.  Lanier also observed that Henry appeared to be in pain throughout their interview.

On December 15, 2003, Kirk Boyenga, Ph.D., and Thomas W. Low, Ph.D., reviewed Henry's medical records for the SSA.  They found that she was moderately limited in her abilities to carry out detailed instructions, to maintain attention and concentration for extended periods, to complete a normal workday and workweek without interruptions from psychologically based symptoms, to perform at a consistent pace, to interact appropriately with the general public, and to respond appropriately to changes in the work setting.  They also found mild limitations in her restriction of activities of daily living and difficulty maintaining concentration, persistence, and pace. They concluded that Henry suffered from dysthymia, a chronic mood disorder.

On July 6, 2004, Dr. Barry Free conducted a physical residual capacity assessment of Henry for the SSA.  He found that she could occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, stand or walk with

normal breaks for a total of 6 hours in an 8-hour day, sit with normal breaks for a total of 6 hours in an 8-hour day, and push or pull without limitation. He also found that she could occasionally climb, balance, kneel, and crouch. He suggested she suffered no manipulative, visual, communicative, or environmental limitations.

On January 7, 2005, Henry visited Dr. Narla again.  She asked for Dr. Narla's opinion regarding her permanent work restrictions.  Dr. Narla noted:

> I made it very clear, since she has not worked for the last 3-1/2 years, I am not certain what restrictions can be given as she has no official work. . . .  I have explained to her that unfortunately since she does not have any job to do there is no place for trying to define the restrictions for her.  If she does wish to have them, she probably would need a functional capacity evaluation.

R. 473.

Henry visited Dr. Heidi Prather, a doctor of osteopathy, on July 14, 2005.  Henry told Dr. Prather that her pain management doctor in Springfield was unwilling to write any restrictions for her work, so she wanted a second opinion.  Dr. Prather diagnosed S1 radicular pain and sacroiliac pain, and she advised Henry to arrange for a functional capacity evaluation so that she could review the results and determine whether Henry should have any work restrictions.

On February 7, 2007, Dr. Chapa performed another consultative examination of Henry for the SSA. He noted that Henry continued to complain of pain in her lower back, radiating into both hips and the left lower extremity. At this meeting, Henry was able to ambulate and bear weight without assistance, and Dr. Chapa noted that she had no difficulty getting on or off the exam table. He diagnosed her with chronic back pain but found her range of motion normal.

That same day, Henry also saw a licensed clinical psychologist, Dolores Trello, who performed a mental status examination for the SSA. Henry told Trello that she felt depressed because her pain controlled her life and she could not do the things she used to do. Trello diagnosed Henry with adjustment disorder with depressed mood and depressed mood associated with chronic pain. She assessed Henry a GAF score of 50 and found serious impairment in vocational and interpersonal functioning due to depression associated with chronic pain. Trello also noted that Henry's understanding, memory, sustained concentration and persistence, social interaction, and adaptation were adequate.

More than a week later, on February 16, 2007, Ronald Havens, Ph.D., performed a psychiatric review of Henry's records for the SSA and also

concluded that Henry suffered from adjustment disorder with depressed mood and depressed mood associated with chronic pain.  Additionally, he concluded that Henry had mild limitations in her daily living activities and in maintaining social functioning.  He found moderate limitations in her ability to maintain concentration, persistence, and pace.  In a task-by-task breakdown, however, Dr. Havens found that Henry was not significantly limited in any tasks, but he rated her ability to maintain attention and concentration for extended periods as moderately limited.  He found no episodes of decompensation.  He summarized his findings as follows:

> Claimant is experiencing depressed mood associated w physical issues, she is fully oriented, free of thought disorder, free of cognitive deficits, claimant is capable of understanding, remembering and carrying out detailed instructions with some moderate limitations in concentration as noted by CE. Claimant has the social skills and the emotional temperament required to interact appropriately with others.  Claimant can adjust to routine changes in the work environment.

R. 551.

II.   FIRST ADMINISTRATIVE HEARING

Two administrative hearings occurred in Henry's case.  The first took place on November 21, 2006, via video conference.  At this hearing, Henry and Bonnie Gladden, a vocational expert, both testified.  Henry was 42 at

the time of this hearing and lived with her husband and 18-year-old daughter.  Henry drove herself to the hearing.  She testified that she was a high school graduate and formerly worked as a machinist in a factory and before that as a census surveyor.  She testified that she stopped working as a machinist because she could not tolerate the pain anymore.  She received a worker's compensation settlement.

At the time of this first hearing, Henry was taking Elavil, Neurontin, Loricet, and a Fentanyl patch for pain.  The medications made her a little tired, but she could think of no other side effects.  At this point, Dr. Narla was the only doctor she was seeing regularly.

Henry testified that at this time, she also was performing physical therapy at home.  The ALJ asked her to explain the physical therapy she was performing at home, and Henry described several exercises.  Then, they had the following exchange:

> A.    I do about five or six different things a day.
> Q.    Do you have any equipment that you use in the process?
> A.    I have a walking --
> Q.    A stationary --
> A.    Yes, I can't talk.  I'm sorry.  I have a treadmill, I have a treadmill, yeah.  And I walk on that occasionally on my own.

R. 585.  Later in the hearing, the ALJ returned to the subject of the

10

treadmill and asked:

> Q.    When you use your treadmill do you have a routine how far you walk, how fast you walk, that sort of thing?
>
> A.    Yeah, I try to keep the routine but it just depends if my body lets me.  But I don't walk -- I probably walk for 20 minutes to 30 minutes, depending on how I feel, at a slow speed and that probably takes me, it probably only takes me a couple miles, not very far, if that.

R. 597.

The ALJ also asked Henry about the symptoms she had experienced since her surgery.  She testified to pain in her waist, center back, hips, and through her legs.  The pain made her weak so that she could not walk up stairs often, she said.  She also found sitting difficult.  Henry did not think her surgery had helped.

Henry testified that she had no health problems unrelated to her back, hip, and leg pain.  The ALJ asked her if she had been treated for mental health problems, and she stated that she went to a psychiatrist once, before her surgery.  Henry stated that she was no longer having any psychological problems, "just normal depression."  R. 589.

Regarding her daily activities, Henry testified that she did normal, easy housework, but often failed to get even that done.  Every morning she got up at 5:20 a.m., when her husband woke up.  Sometimes she helped him

make his lunch before he went to work.  After her husband left for work, Henry usually performed light housework, like cleaning the kitchen or doing the laundry.  She normally made the beds but rarely cooked.  She loaded the dishwasher, cleaned the toilet and bathroom sink, and vacuumed three times a week, one room at a time.

Once a week Henry and her husband went grocery shopping together, but they also bought take-out four or five times a week.  Henry estimated that she drove 20 miles a week, to the library and to run other errands.  She also estimated that she spent at least half of each day reading novels.  She thought she probably read 4 or 5 novels a week.  She estimated that she spent more than 50 percent of her day sitting, 45 percent with her feet up and back reclined.  She spent only 20 percent of her day standing or walking.  Henry testified that she used a computer for about half an hour twice a week.  She had three dogs and two cats and was the primary caretaker for these pets.  She did not walk the dogs, however; instead she turned them out into the yard.  In the summers she would plant a few flowers, but could no longer do the gardening she used to do.  She also could no longer attend her daughter's high school sports events.

The ALJ also posed a series of hypothetical questions to the vocational

12

expert.  He asked Gladden about the job prospects of a younger individual with a high school education and the same work history as Henry, and Gladden testified that such a person could perform light exertional work that involves only occasional climbing, stooping, or crouching, and no climbing ladders, ropes, or scaffolds.  If this person were limited to sedentary work and needed to alternate between siting or standing every 30 to 45 minutes, Gladden believed that in Illinois, this person could work one of 7,100 assembly jobs, 7,000 cashier jobs, 6,500 phone order clerk jobs in the food and beverage industry, and 4,000 food checker jobs.  Some of those jobs would allow this person to elevate her feet 10 inches off the floor, but Gladden testified that a person who needed to elevate her feet 20 inches or to recline significantly might not be able to perform these jobs.

III.   <u>THE ALJ'S FIRST DECISION</u>

The ALJ concluded that Henry was not disabled under the Social Security Act and issued his first Decision on December 8, 2006.  Because the ALJ's second Decision supersedes his first Decision, the Court will discuss the first Decision only briefly, for context.

In his first Decision, the ALJ found that Henry suffered from back pain, spinal disorder, and sacroiliac joint disorder, all severe impairments.

Nonetheless, he concluded that Henry did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments. The ALJ found that Henry had the residual capacity to perform light work. He concluded that she could lift 20 pounds occasionally and 10 pounds frequently, and she could sit up to 6 hours in an 8-hour day with the option to sit or stand every 30 to 45 minutes. He also found that she needed to elevate her legs up to 10 inches and avoid climbing ladders, ropes, and scaffolds, but occasionally she could stoop, crouch, and climb ramps and stairs.

According to the ALJ, Henry's impairments could be expected to produce some symptoms, but her claims regarding their intensity, persistence, and limiting effects were not entirely credible. The ALJ discussed the findings of Dr. Narla, Dr. Chapa, and Lanier and concluded that they did not support Henry's claim that she could not work. Specifically, he noted that Dr. Narla recorded symptom magnification; Dr. Chapa found that only Henry's tenderness of the sacroiliac joints was abnormal; and Lanier found only mild depression. The ALJ discussed Henry's daily activities and concluded that her ability to perform a home exercise program (including walking on a treadmill), read 4 or 5 books a

week, perform household chores, and use a computer contradicted her claims of disability.  He also noted that Henry visited two of her doctors requesting opinions of disability, and they both refused absent a functional capacity evaluation, which she neglected to have performed.

The ALJ held that while Henry could not perform any past relevant work, significant jobs existed in the national economy that she could perform, including work as an assembler, cashier, phone order clerk, and food checker.  Thus, the ALJ concluded, Henry was not disabled.

IV.  <u>THE APPEALS COUNCIL'S FIRST DECISION</u>

Henry appealed the ALJ's denial, and on July 5, 2007, the Appeals Council remanded the case back to the ALJ.  The Appeals Council held that the ALJ failed to adequately evaluate Henry's mental impairments. Specifically, the Appeals Council ordered analysis of the consultative psychologist's opinion that Henry's GAF was 55, indicating serious symptoms or difficulty in social or occupational functioning, and the state agency psychological reviewing physicians' opinions that Henry had severe affective disorder resulting in moderate limitations in functioning.  Further, the Appeals Council criticized the ALJ for concluding that Henry's subjective complaints were not credible without evaluating the intensity,

persistence, and limiting effects of her symptoms through discussion of objective medical evidence, prior work record, daily activities, precipitating and aggravating factors, the effects of medication and other treatments, and the location, duration, frequency, and intensity of her pain.

V.     THE SECOND ADMINISTRATIVE HEARING

Henry's second hearing occurred September 14, 2007, also via video conference.  At this hearing, Henry, her husband, and Gladden testified. Because this was a second hearing, the ALJ focused on changes in Henry's condition since the first hearing.

Henry testified that since her first hearing, she had only one doctor's appointment, with Dr. Narla.  At this appointment, Dr. Narla increased her medication dosage but added no new prescriptions.  She stated that she never had a functional capacity evaluation because she could not afford one.

The ALJ asked Henry about any changes in her daily routine since the first hearing.  She stated that now, on the second day of each Fentanyl patch she used, the medication seemed to wear off and the pain became so intense that she simply stayed in bed or her recliner.  She estimated that now she sat at least 75 percent of each day, maybe up to 100 percent. When she sat, for all but 5 percent of her day, she reclined and elevated her

feet 12 to 16 inches.  She also stated that she now did hardly any cooking, laundry, or dishes, and no vacuuming.  She also no longer thought she drove 20 miles a week; instead, she estimated 10 miles a week.

Henry still read 4 or 5 novels a week, however.  She said she probably read for 10 hours a day, but she thought her ability to concentrate was terrible.  She said she got confused easily and blamed her medication.

The ALJ also asked Henry whether she is still using the treadmill, and she explained:

> A.   No, and I want to go back on that when I mentioned that treadmill.  I, I don't know, I was referring to before I fell ill.  I, I'm really confused.  I really apologize.  But, no, I got -- no, I don't use the treadmill.  No.
>
> Q.   And do you do any walking?  I think my notes indicate that you were walking up to three miles maybe.
>
> A.   Well, see that, that's another thing too.  I don't know why I said that because I was referring to before I felt, before I felt -- I was all confused.  I didn't understand the question apparently.  It's before I felt bad.  No, I don't walk.  Maybe through the grocery store with my husband, and that's about it.

R. 621.  Later, the ALJ questioned Henry's husband, who had been waiting in the hall, about Henry's treadmill use.  He stated that Henry had not used her treadmill in at least five years.  Henry's husband and the ALJ then had the following exchange:

Q.    How do you know that?

A.    Because it's sitting in our bedroom, and it's stacked with stuff all over it, and it hasn't moved in five years.

Q.    But you don't know what she's doing during the day, so you're not aware of what she's doing during the day.

A.    No, sir, I don't, but I don't think that she would take everything that's stored on that treadmill off of that treadmill.  I mean I don't know.  I'm not home during the day, but if you want my opinion, no, she does not use the treadmill.

R. 642.

Henry's husband also testified that she could not do much house cleaning anymore, and her medicines seemed to make her confused, forgetful, and tired.  He observed that she spent most of her time reclining with her feet elevated.

The ALJ also questioned Gladden again regarding the job prospects of an individual with Henry's education and past work experience and the ability to work at the sedentary exertional level.  Gladden testified that such a person could work a number of jobs that do not involve climbing ladders, ropes, or scaffolds; more than occasionally climbing ramps or stairs or balancing, stooping, kneeling, crouching or crawling; or the performance of complex tasks.  Specifically, she stated that in Illinois, such a person could work one of 7,000 cashier jobs, 7,100 assembly jobs, 3,000 packing and

filling machine operator jobs, or 4,436 receptionist or information clerk jobs.  Gladden thought such a person's need to elevate her feet 12 inches and alternate between sitting or standing every 30 to 45 minutes would not change the number of jobs available to her.  If such a person had to recline and elevate her feet 16 to 20 inches, however, the number of jobs available would decrease.  Additionally, if this person had occasional deficits in concentration, persistence, and pace, she likely could not keep one of these jobs.

## VI.  THE ALJ'S SECOND DECISION

The ALJ issued his second opinion October 16, 2007.  Again, he denied Henry's claim.

Preliminarily, the ALJ determined that Henry met the insured status requirements of the Social Security Act.  He then discussed the five-step analysis set out in 20 C.F.R. §§ 404.1520 & 416.920.  The analysis requires a sequential evaluation of: (1) whether the claimant is engaged in substantial gainful activity; (2) the severity and duration of the claimant's impairment; (3) whether the impairment equals a listed impairment in Appendix 1; (4) whether the impairment prevents the claimant from doing his past relevant work; and (5) whether the claimant can perform other

work, given his residual functional capacity, age, education, and past work experience.  20 C.F.R. §§ 404.1520(a)(4) & 416920(a)(4).  The claimant has the burden of presenting evidence and proving these issues on the first four steps.  The SSA has the burden on the last step; the SSA must show that, considering the listed factors, the person can perform some type of gainful employment that exists in the national economy.  Knight v. Chater, 55 F.3d 309, 313 (7th Cir. 1995); Roth v. Shalala, 45 F.3d 279, 282 (8th Cir. 1995).

The ALJ then applied this analysis to Henry's request for benefits. First, the ALJ held that Henry had not engaged in substantial gainful activity since July 6, 2001.  Second, the ALJ found that Henry suffers from degenerative disc disease, SI joint dysfunction, and adjustment disorder with depressed mood, all severe impairments.

Third, the ALJ found that none of Henry's impairments equaled a listed impairment.  Specifically, he found that Henry does not have a major dysfunction of a joint because she can ambulate without severe limitation. He found that she does not have a disorder of the spine because the record contains no evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis resulting in severe limitations in function.  Finally,

he found that Henry's mental impairment does not meet or equal the criteria of listing 12.04 because she suffers only mild restrictions in daily living activities, mild difficulties in maintaining social functioning, no episodes of decompensation, and only moderate difficulties in concentration, persistence, or pace.

Fourth, the ALJ concluded that Henry cannot perform her previous jobs. According to the ALJ, Henry has the residual capacity to perform sedentary work, except that she should avoid climbing ladders, ropes, and scaffolds. She is limited to occasional balancing, crawling, stooping, and crouching and should be able to sit or stand at 30- or 45-minute intervals and elevate her legs 12 inches. Additionally, she should avoid jobs that involve complex tasks.

Regarding Henry's physical condition, the ALJ found that Henry suffers severe impairments, but not completely disabling ones. He concluded that Henry's conditions could be expected to produce some symptoms, but her statements concerning their intensity, persistence, and limiting effects were "not entirely credible." R. 19. The ALJ discussed Henry's prior treatment and stated that Dr. Narla and Dr. Bland both noted a tendency by Henry to magnify her symptoms. He also discussed Henry's

statements regarding her symptoms and daily activities and concluded that

he found her testimony untrustworthy.  Specifically, he held:

> At the first hearing the claimant testified that after her back surgery in 2002 she has engaged in home exercise program which includes walking on a treadmill. . . .  At the second hearing she testified that her activities are now much more limited, and with regards to using the treadmill, she must have misunderstood the question at the first hearing because she has been unable to use the treadmill since her surgery in 2002.  The undersigned is persuaded that claimant's testimony at the second hearing was intentionally false.  The most compelling evidence to support this is the Activities of Daily Living Questionnaire prepared by the claimant on November 12, 2003, which states that she was using the treadmill for 20 minutes a day (Ex. 8E/8).  During the first hearing the claimant demonstrated the ability to hear and comprehend the questions posed to her, and it is very unlikely that there was any confusion or misunderstanding about the question.  Her attempts to recast her condition as being more limited are consistent with the observation made by her doctors when they recorded that she has a tendency toward symptom magnification, and this is more evidence that she lacks credibility.

R. 21.  The ALJ also found Henry's husband's statements regarding her

treadmill use to be suspect, and the ALJ afforded her husband's testimony

"little weight."  R. 21.

Overall, the ALJ found Henry's testimony inconsistent with the

objective medical evidence and Dr. Chapa's examination.  He also

highlighted the fact that after seeking opinions regarding her ability to work

from two of her doctors, Henry failed to follow their advice to obtain a functional capacity evaluation. The ALJ concluded that her doctors' refusal to provide any opinions regarding her work restrictions indicated that they did not believe she should be restricted from all work. Additionally, the ALJ noted that while the SSA physicians did not consider whether Henry needs to elevate her feet while she works, their opinions otherwise parallel his findings regarding her residual functional capacity.

Regarding Henry's mental condition, the ALJ found that she suffers an impairment, but again, not a completely disabling one. He discussed Lanier's and Trello's assessments of Henry's condition. The ALJ afforded little weight to Trello's opinion that Henry had a GAF of 50, which suggests severe limitation in functioning. According to the ALJ:

> Dr. Trello's assessment is based upon the claimant's subjective statements to her. Because the claimant lacks credibility and has consistently exaggerated her symptoms Dr. Trello's determination that the claimant has serious impairments in vocational functioning can not be given significant weight. The claimant testified that she spends a great deal of time reading, but there is no indication that she explained this in detail to Dr. Trello. Instead she told Dr. Trello that her ability to concentrate is poor. Dr. Trello indicates that the claimant demonstrated evidence of being hard of hearing, however when the claimant appeared for the hearing and when she interacted with other healthcare providers she was able to hear and speak without difficulty. Dr. Trello indicates that the claimant alleges

23

> problems with memory loss, but her testing showed that her
> memory was intact.  These inconsistencies are examples of how
> Dr. Trello's assessment is flawed based upon subjective
> statements made by the claimant.

R. 20.  In contrast, the ALJ found Dr. Havens' opinion of only moderate

limitation in ability to maintain concentration reliable.  The ALJ assigned

this opinion significant weight because he found it well reasoned and

consistent with the medical evidence.

Fifth, the ALJ found that the SSA satisfied its burden to show that

Henry can perform other work, given her residual functional capacity, age,

education, and past work experience.  He cited the vocational expert's

testimony that a hypothetical individual with Henry's vocational profile and

exertional and nonexertional restrictions could work as a cashier, small

products assembler, packaging and filling machine operator, receptionist and

information clerk, and phone order clerk.  Because the ALJ found that a

significant number of jobs that Henry could perform exist, he held that she

is not disabled.

VII.  THE APPEALS COUNCIL'S SECOND DECISION

On March 3, 2008, the Appeals Council denied Henry's request for

a review of the ALJ's second Decision.  Henry argued that while the ALJ

used her testimony that she read 4 to 5 books a week to find that she is able to concentrate, the ALJ never asked Henry whether she understood what she read.   She also argued that her husband's testimony supported her statements that she never used the treadmill, and the ALJ should not have discounted his testimony as false because he waited in the hall during Henry's testimony and could not tailor his testimony to match hers. Moreover, Henry argued that the ALJ also should have credited her husband's testimony regarding the amount of housework she performs and her need to elevate her feet and recline while seated.   Henry also criticized the ALJ's failure to mention the vocational expert's testimony that a person who needs to elevate her feet 16 inches probably could not work most of the jobs she testified Henry could perform.

## ANALYSIS

Henry argues that this Court should reverse the ALJ's finding that she is not disabled for three reasons: (1) the ALJ failed to adequately evaluate the effects of her depression on her residual functional capacity; (2) his credibility determinations amounted to reversible error; and (3) he failed to consider the effect of her need to sit in a reclining position when assessing her ability to perform work in the national economy.   A claimant is disabled

for Social Security purposes if she demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  In reviewing an ALJ's decision, however, this Court is not to determine whether the claimant is disabled; instead, the Court decides only whether the ALJ's findings were supported by substantial evidence.  Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971).  This Court must accept the ALJ's findings if they are supported by substantial evidence and may not substitute its judgment for that of the ALJ.  Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986).  Yet, the ALJ must at least minimally articulate his analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994).  The Court must be able to "track" the ALJ's analysis to determine whether the ALJ considered all important evidence.  Diaz v. Chater, 55 F.3d 300, 308 (7th Cir. 1995).  Where the Court cannot, and the record does not

conclusively demonstrate that the claimant is disabled, the Court must remand for further proceedings; these proceedings can include the taking of additional evidence.  Wilder v. Chater, 64 F.3d 335, 338 (7th Cir. 1995). In this case, the Court can track the ALJ's decision, and the decision is supported by substantial evidence.

## I.   EFFECTS OF DEPRESSION

According to Henry, the ALJ failed to adequately evaluate the effects of her depression on her residual functional capacity.  Specifically, Henry argues that the ALJ failed to account for her depression when determining her residual functional capacity and considering jobs she could perform at step 5 of the sequential evaluation process.

The ALJ found that Henry's depression deprived her of the residual functional capacity to perform jobs that involve complex tasks.  Based on Dr. Havens' opinion, the ALJ found that Henry is moderately limited in her ability to maintain concentration.  The ALJ analyzed Trello's opinion that Henry's depression more severely limits her, but he rejected this opinion as based on Henry's subjective statements, which the ALJ found untrustworthy.  The Court can track the ALJ's analysis of Henry's mental impairment, and his finding that she is limited only to the extent that she

should avoid complex tasks is supported by substantial evidence.

Henry contends that at step 5, when questioning the vocational expert regarding jobs Henry could perform, the ALJ was required to ask how limitations in concentration, persistence, or pace would affect Henry's job prospects. Henry is incorrect. The ALJ must question the vocational expert about the job prospects of a hypothetical person with the same limitations he determines the claimant suffers, but here, the ALJ found Henry's depression limited her only in her ability to perform complex tasks. The ALJ specifically instructed the vocational expert to consider a hypothetical individual who could not perform complex tasks. R. 643. He then relied on the vocational expert's testimony in identifying jobs that Henry could work. Thus, the ALJ's step 5 analysis accounted for his assessment of Henry's mental limitations. The ALJ did not fail to evaluate the effects of Henry's depression on her residual functional capacity and resulting job options.

II.   CREDIBILITY DETERMINATIONS

Henry also argues that the ALJ's credibility determinations were improper and amounted to reversible error. An ALJ's credibility determinations are afforded substantial deference, however. Jens, 347 F.3d

at 213.  This Court can reverse an ALJ's credibility determinations only if the claimant shows that the findings were "patently wrong."  Id.  Henry has not done so here.

Henry argues that the ALJ improperly found Henry untruthful regarding her ability to stand or sit in a normal sitting position for more than 30 minutes, to concentrate, and to use a treadmill.  Yet, the ALJ explained the basis of his findings on each of these issues.

First, regarding Henry's ability to stand or sit in a normal sitting position for more than 30 minutes, the ALJ noted that six months after Henry's surgery, Dr. VanFleet found that she could stand and ambulate without any difficulty.  No doctor found that she could stand or sit for only 30 minutes.  Moreover, Dr. Narla noted that Henry tended to magnify her symptoms.  Henry is correct that the ALJ mistakenly stated that two of Henry's doctors noted symptom magnification, when in fact only one had, but this discrepancy does not make the ALJ's ultimate credibility finding patently wrong.

Second, regarding Henry's ability to concentrate, the ALJ concluded that Trello's findings were unreliable because they were based on Henry's subjective statements.  Henry argues that all psychological testing is based

on subjective statements, but this does not mean that an ALJ must accept any opinion based on subjective statements.  The ALJ also concluded that Henry's ability to read 4 or 5 novels a week indicated that any limitation in her ability to concentrate could not be significant.  Henry argues that without evidence of how difficult the books are, or how much she understands of what she reads, the ALJ cannot base an opinion on concentration on her reading.  Again, however, Henry's criticism does not demonstrate that the ALJ's finding was patently wrong.  He was entitled to rely on commonsense in assessing Henry's testimony regarding her daily activities, and it is not unreasonable to conclude that an individual who reads at least 4 or 5 novels a week lacks significant concentration limitations.  Finally, the ALJ also rejected Henry's husband's testimony that she must have difficulty concentrating because when he comes home at night, she often is asleep.  According to the ALJ, the fact that Henry is asleep when her husband comes home does not necessarily indicate lack of ability to concentrate, especially given her testimony that she spends most of the day reading.  Again, nothing indicates that this finding is patently wrong.

Third, regarding Henry's ability to use a treadmill, the ALJ found the

discrepancy between Henry's testimony at the first hearing and her testimony at the second to indicate dishonesty at the second hearing. Henry claims that the ALJ should have considered the possibility that Henry was simply confused at the first hearing. The ALJ did consider this possibility, however, noting: "During the first hearing the claimant demonstrated the ability to hear and comprehend the questions posed to her, and it is very unlikely that there was any confusion or misunderstanding about the question." R. 21. As the Seventh Circuit has noted, "hearing officers are in the best position to see and hear the witnesses and assess their forthrightness." <u>Jens</u>, 347 F.3d at 213. Nothing in the record persuades the Court that Henry's explanation is the only reasonable explanation for the discrepancy between her two statements. In fact, the first exchange between Henry and the ALJ regarding the treadmill at the first hearing seems to relate to her current activities. Henry testified that she performed five or six different physical therapy exercises each day and walked on the treadmill:

> A.  I do about five or six different things a day.
> Q.  Do you have any equipment that you use in the process?
> A.  I have a walking --
> Q.  A stationary --
> A.  Yes, I can't talk.  I'm sorry.  I have a treadmill, I have a

treadmill, yeah.  And I walk on that occasionally on my own.

R. 585.  Given this exchange, the Court cannot conclude that the ALJ's conclusion regarding Henry's initial treadmill testimony lacked substantial supporting evidence.  Similarly, Henry's husband's support of her testimony that she had not been able to use the treadmill for years does not automatically confirm her testimony.  The ALJ was entitled to assess Henry's husband's credibility, and Henry has not shown that the ALJ's credibility determination regarding Henry's husband was patently wrong. The fact that the ALJ misstated Henry's husband's testimony, placing the treadmill in the basement as opposed to their bedroom, does not change the Court's analysis.

As noted, the ALJ explained each of his credibility findings.  Because the Court cannot conclude that the ALJ's findings lacked substantial evidence, the findings provide no basis for reversal.

III.   NEED TO RECLINE

Henry also argues that the ALJ committed reversible error when he failed to consider the effect of her alleged need to sit in a reclining position when assessing her ability to perform work in the national economy.  Henry

asserts that she must recline while sitting and points out that the vocational expert testified that a need to recline would substantially decrease the number of jobs available.  Yet, the ALJ did not find that Henry needs to recline.  In setting her residual functional capacity, he found that she must elevate her feet 12 inches, but he did not conclude that she must recline.  Indeed, no medical evidence supports her claimed need to recline.  Only Henry's and her husband's testimony supports this limitation, and as noted above, the ALJ found that their testimony was unreliable.

In determining the number of jobs available to a claimant, an ALJ must question the vocational expert regarding all components of the claimant's residual functional capacity, but evidence that additional limitations would affect a claimant's ability to work should not affect the ALJ's decision.  Because the ALJ found that Henry's residual functional capacity did not include the need to recline, he was not required to consider this limitation in assessing the number of jobs available to her in the national economy.  Thus, his failure to consider the effect of her alleged need to sit in a reclining position when assessing her ability to perform work in the national economy is not grounds for reversal.

THEREFORE, Plaintiff's Motion for Summary Judgment and

Memorandum of Law in Support Thereof (d/e 11) is DENIED and Defendant's Motion for Summary Affirmance (d/e 13) is ALLOWED.  All pending motions are denied as moot.  This case is closed.

IT IS THEREFORE SO ORDERED.

ENTER:   June 9, 2009

FOR THE COURT:

_____ s/  Jeanne E. Scott _____
JEANNE E. SCOTT
UNITED STATES DISTRICT JUDGE